IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TERRANCE REEVES, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> LLOYD J. AUSTIN, III, ) <br> *Secretary, U.S. Department of Defense, et. al.*, ) <br> ) <br> Defendant. ) | Civil Action No. 1:23-cv-01149 (AJT/LRV) |

## ORDER

In this employment discrimination case, Defendant Lloyd J. Austin, III and Defendant Frank D. Whitworth have filed a joint Motion for Summary Judgment, [Doc. No. 50] (the "Motion"). For the reasons that follow, the Motion is **GRANTED** as to both remaining claims.

### I. BACKGROUND

Reeves filed this Title VII action on July 13, 2023 for unlawful discrimination (Count I), a hostile work environment (Count II), and retaliation (Count III). *See generally* [Doc. No. 1]. On December 19, 2023, the Court dismissed Reeves' claim of discrimination (Count I) for failure to state a claim. *See* [Doc. No. 29]. His remaining claims of hostile workplace and retaliation are the subject of the Defendants' motion for summary judgment. Based on the summary judgment record, the following facts are either uncontested or reflect evidence, including Plaintiff's own testimonial evidence, viewed most favorably to Plaintiff Terrance Reeves ("Reeves"):

In early July 2019, Reeves was hired with a probational status to serve as the Chief Privacy Officer ("CPO") of the National Geospatial-Intelligence Agency (the "NGA"). [Doc. No. 51-2] at 5. In that capacity, Reeves reported to Deputy Director Gregory Gondeck ("Gondeck"), who in turn reported to Director Kevin Cichetti ("Cichetti"). *Id.* at 10–11. Cichetti had participated in Reeves' interview process and recommended hiring him for the CPO position. *Id*. at 207–8.

1

From the outset of his employment, there was friction between Reeves and his supervisors, which Reeves views as emanating from racial animus, and which Reeves thought was evident in his very first meeting with Gondeck and Cichetti in July 2019. During that meeting, Reeves was told by Cichetti that he should not reach out to his predecessor because she had an ongoing EEOC complaint and if he did, they would "fire him" and his "pretty government career would be over. Quote." *Id.* at 82–84.[1] They also repeatedly noted the race of another one of his predecessors who he was instructed not to contact. *Id*. at 82–84.[2] Following that initial meeting, Reeves continued to experience instances of what he regarded as racial animus on the part of Cichetti and Gondeck, including the following:

1. In August 2019, Cichetti and Gondeck discussed the performance of the Privacy and Civil Liberties Division with contractors, stating that they do not know what those employees do other than work in a spreadsheet. *See* [Doc. No. 58-4] at 5.

2. In October 2019, during a meeting with Reeves, Cichetti stated that because he was robbed by African American men as a young person in New York, he "looked at people differently." [Doc. No. 51-2] at 90.[3]

3. Also in October 2019, Cichetti left sticky notes on Reeves' desk that said things like "all my pants are sassy" and "hot mess citation," which Reeves took to mean that he is feminine, and found it to be inappropriate. *Id.* at 99.[4]

---

[1] Reeves quoted different language in his interrogatory answers. *See id.* at 13.
[2] Both Gondeck and Cichetti have contested this version of the events, noting that Reeves' predecessor did not file an EEOC complaint, and that they did not know the predecessor was non-White. *Id*. at 170 (Gondeck's statement); *id.* at 203–5 (Cichetti's statement). Cichetti also explained that he did not recall that Gondeck was present for the conversation, and that it happened in the context of Reeves' proposing names for outreach and mentorship for his new role, and that he was told that these individuals would not meaningfully contribute to his knowledge base. *Id*. at 204.
[3] Cichetti denies that he made this statement, which he considers amounts to "slander." *Id*. at 209.
[4] Cichetti did not dispute leaving a sticky note, but submitted that the staff often bantered with one another and he thought it was funny, and that Reeves was not singled out because other staff members received notes. *Id.* at. 213. He also stated that the sticky note was from a pad of sticky notes that belonged to another employee, and they were in the form of a traffic citation. *Id.*

4. Later in October 2019, Reeves was invited to Cichetti's Halloween party, but his other non-White team members were not, and when Reeves questioned Cichetti about their exclusion, Cichetti said that it was because (unlike him) his team members did not have college degrees and therefore would not feel comfortable with White people dressed in drag, as Cichetti was dressed at the Halloween party. *Id.* at 21 ("This event displayed the … favoritism between MOC leadership and the other teams within MOC"); *id.* at 132 ("His quote was, you went to college. I think you've been around enough people so you could feel comfortable around White people dressed in drag. I don't think your team members will feel comfortable in that.").

5. Gondeck and Cichetti met with Reeves twice in early February 2020 to discuss performance issues, along with dress code violations, and during the meeting about performance issues Reeves testified that Gondeck lost his temper and "ball[ed] up his fists," making Reeves fear for his safety. [Doc. No. 58-5] at 11 ("As Mr. Gondeck continued to yell, I noticed his hands was tight and shaking. I was fearful of his life [sic].").[5] After this incident, Reeves made a confidential statement about the incident to the NGA Diversity and Inclusion Office and was told that he could either report the incident through a formal EEOC complaint or participate in alternative dispute resolution. He chose to not proceed with either option. [Doc. No. 51-4] at 28, 29.

6. After his meeting with Reeves in early February 2020 about the dress code, Cichetti emailed the full MOC team that business attire or business casual attire was expected on Mondays through Thursdays, and attached specific guidance. [Doc. No. 51-4] at 37–41. In the attached NGA policy statement, "tennis shoes" were listed under casual

---

[5] Gondeck and Cichetti have submitted testimony disputing Reeves' testimony, stating that Reeves interrupted them and became aggressive when he was asked to stop interrupting. [Doc. No. 52-1] at 185; *id.* at 218–19.

attire. *Id.* at 41. Reeves believes that Gondeck and Cichetti implemented an entirely new dress code policy aimed at his sneakers[6] and pointed to the fact that he had been interviewed while wearing pink tennis shoes.[7] He further testified that Cichetti and Gondeck did not discuss the dress code with anyone except Reeves. [Doc. No. 58-5] at 14.

7. In late May of 2020, unlike performance reviews for other Division Chiefs (all of whom were White), Cichetti attempted to participate in Reeves' performance review. Reeves was told that Cichetti was participating because there would be "difficult conversations." [Doc. No. 51-4] at 49. Reeves requested that a neutral representative be at the meeting because he did not like that he was being treated differently. *Id.* at 49; *see also* [Doc. No. 58-5] at 16. In light of Reeves' objection, the meeting ended without any evaluation, and that same day, Reeves reported to two individuals in Human Development that he had been harassed by his supervisors since September 2019. [Doc. No. 51-4] at 66–69. The next day he called the NGA Anti-Harassment hotline. *Id.* at 90.

8. The midpoint review was ultimately conducted on June 11, 2020 without Cichetti and with Jennifer Harris ("Harris"), a neutral party from Human Development. *Id.* at 52. Gondeck informed Reeves that he was not meeting performance standards, citing specific examples. *Id.* at 54–55. Reeves requested a written plan addressing how he could ensure his success, and an action item list was provided to him. *Id.* at 58, 63.

---

[6] The documentary evidence in the record shows that the dress code Reeves thought was a new policy was in fact not a new policy, nor one that Cichetti himself had developed. *See* [Doc. No. 51-4] at 37–41.

[7] Pink tennis shoes are not mentioned anywhere in Reeves' briefing. At oral argument, counsel submitted for the first time that this was evidence that the sneaker policy was new. The sneakers themselves were briefly mentioned in Reeves' deposition. *See* [Doc. No. 51-2] at 88.

9. On July 10, the Director of Human Development opened an official inquiry into Reeves' allegations against Gondeck and Cichetti. [Doc. No. 51-4] at 119. After the investigation was opened, Gondeck and Cichetti became aware of the complaint. [Doc. No. 51-2] at 168; *id.* at 202.

10. On August 7, 2020, Reeves filed an informal EEOC complaint, *id.* at 107, and on October 5, 2020, filed a formal complaint with the EEOC, *id*. at 112.

11. Reeves was given a final close-out performance review of "Unacceptable" in October 2020. *Id.* at 157–68. Reeves contends that this rating was retaliatory, because he had many accomplishments during his tenure at the NGA, and because his direct reports all received positive reviews.

12. On January 15, 2021, after a series of internal reviews by human resources personnel, Reeves was given notice of his termination, effective January 29, 2021. *See* [Doc. No. 52-1] at 67; *id.* at 80; [Doc. No. 51-4] at 132.

In response to Reeves' testimony and argument regarding racial animus, Defendants contend that Reeves was terminated when his performance failed to improve after repeatedly being given poor performance ratings, counseling, and multiple opportunities to improve with concrete feedback. Defendants argue that his poor performance was documented consistently and long before Reeves filed his complaints about his supervisors, and certainly long before they became aware of those complaints. [Doc. No. 51] at 2. More specifically, Defendants point to following uncontested facts:

1. Just two months after Reeves began his employment at the NGA, Reeves began to receive poor performance reviews. In September 2019, Gondeck raised the following concerns about Reeves' performance with the Division Chief of Performance Management and Pay and Employee Relations:

> JJ…I have an employee … that I have some performance concerns [sic] and I want to start the dialogue now…. he is on probation but only been here about 2½ months. He is struggling with deliverables not being met … and ensuring the quality (attention to detail) of work)…. He is also struggling on the transition from being a team member to being a leader/supervisor mainly in managing the workload and listening to his team mates…. [T]here have been no discipline issues, I just want to ensure we (boss and I) are on the right path to address the performance and help develop the employee.

[Doc. No. 51-2] at 242–43.

2. Following his communication about Reeves' performance, Gondeck was directed to meet with LaToya Allen, a Branch Chief in Human Development, in order to develop a plan to help with Reeves' performance issues. *Id.* at 237–42. Gondeck did so, and then met with Reeves, along with Cichetti, on October 10, 2019, to discuss their concerns about his performance and a plan for improvement. *See* [Doc. No. 51-3] at 32–40.

3. In a follow up email the next day, Gondeck attached the script that was read to Reeves on the call. *Id.* at 32–36. The script states that Gondeck and Cichetti "discuss with you on a weekly basis (sometimes multiple times per week) MOCP product is neither timely nor of requisite quality. We are not seeing improvement; in fact, it seems to be getting worse." *Id.* at 33. The script goes on to say that "many members" of Reeves' team "feel as though you do not respect their experiences or opinions and have been dismissive or condescending towards them." *Id.* The script indicates that Reeves was then encouraged to enroll in management training courses. *Id.* at 34.

4. In his response to this email, Reeves did not contest the accuracy of the script or any of the substantive issues documented, but instead asked for time for his team to acclimate, build trust, and grow as a team. *Id.* at 39. Less than two weeks later, on October 21, Gondeck and Cichetti met with Reeves to discuss project delays and

engagement with team members. *Id.* at 46. The meeting notes indicate that Reeves was given an example about a high priority missed deadline from the prior week, *id.* (stating that "we do not understand why you would not reply before going on vacation"), and that "multiple teammates" had told the supervisors that Reeves did not "say hello or good morning" and that he did not respond to their salutations, *id.*[8]

5. From his supervisors' perspectives, Reeves' performance issues persisted during the following months, with members of Reeves' own team (including those he says he sought to protect from perceived Title VII violations) raising concerns about his timeliness, substantive work product, and manner of engagement. *See* [Doc. No. 51-3] at 65–69 ("I did want to make my displeasure known as he essentially disregarded and disrespected the opinions of two colleagues with no basis whatsoever."); *id.* at 72–75 ("Mr. Reeves cannot be counted on to provide timely or substantive contributions to MOCP work products … [and] he tends to treat everyone as though they aren't as intellectually capable as he is."). At least one contractor resigned because of Reeves,[9] describing Reeves in an email as "hostile, unreliable, untrustworthy, disrespectful, stubborn," and lacking subject matter expertise, among other things. *Id.* at 184.

6. In April and May of 2020, Cichetti and Gondeck documented for Employee Relations five instances where (1) Reeves missed deadlines for work product that he was responsible for, including "hard" external deadlines set by the Department of

---

[8] Although Reeves could not recall the name of one of the three members of his team, [Doc. No. 51-2] at 57, he does recall that all three team members were "minority individuals," [Doc. No. 1] ¶ 3, and does not allege that any of the complaints about his work performance by these team members were racially motivated.

[9] Cichetti testified that two contractors resigned because of Reeves, [Doc. No. 51-2] at 217, but Reeves has denied that one contractor's resignation was because of him, *see* [Doc. No. 1] ¶ 32; [Doc. No. 58-5] at 11 (explaining that one of the contractors told Reeves she was leaving because she wanted to go back to working for the Government).

Defense, and (2) in their view, failed to take accountability for the same. [Doc. No. 51-4] at 7–11.

7. In April 2020, Gondeck began the process to terminate Reeves' employment by drafting a "Memorandum for Record" about Reeves' failure to improve performance despite receiving actionable feedback, but that process was paused as a nonessential function at the beginning of the Covid pandemic. *Id.* at 129.

8. On June 11, 2020, Reeves' mid-year review, which had been adjourned in late May because of Reeves' objections to Cichetti's participation, was ultimately conducted without Cichetti and with Harris, a neutral party from Human Development. *Id.* at 52. Gondeck informed Reeves that he was not meeting performance standards along with specific examples. *Id*. at 54–55. Reeves requested a written plan about how he could ensure his success, and an action item list was provided to him. *Id.* at 58, 63.

9. In September 2020, the NGA internal investigator issued a report on Reeves' allegations against Gondeck and Cichetti, [Doc. No. 51-4] at 139–51, which detailed observations from several employees that Gondeck and Cichetti often made inappropriate remarks and jokes at their staff's expense, including comments on dress, on intellectual ability, and other matters. *See, e.g.*, *id.* at 148. However, the report concluded that there was no evidence to support Reeves' complaint of harassment or discrimination, and that Reeves had "both performance and interpersonal relations issues." *Id*. at 150.

10. In October 2020, Reeves was given a final close-out performance review of "Unacceptable" by Gondeck. *Id.* at 157–68. He appealed his rating first to Gondeck, and then to the "Performance Management Review Authority." Gondeck did not make any changes. The assigned reviewer changed one performance element, but

   otherwise denied the requested changes. [Doc. No. 51-2] at 39–52. Reeves' second appeal to the Deputy Associate Director resulted in two further changes, but overall his rating remained "Unacceptable." [Doc. No. 51-4] at 135.

11. The NGA Personnel Evaluation Board convened to discuss Reeves' removal and ultimately recommended his removal to Employee Relations. [Doc. No. 52-1] at 67; *id.* at 80; [Doc. No. 51-4] at 132 ("The number of specific examples of missed deadlines, poor workmanship, and failure to meet privacy breach reporting timeline requirements, which are established in law and policy and not at the discretion of the agency, suggests that the performance rating was appropriate").

12. On January 15, 2021, Employee Relations sent Reeves a notice informing him that his employment would be terminated effective January 29, 2021. [Doc. No. 51-2] at 95–96.[10]

## II. LEGAL STANDARD

When reviewing a motion for summary judgment, the Court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The central question at the summary judgment stage is whether the nonmovant has produced enough evidence to demonstrate that a "dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. DISCUSSION

Title VII prohibits "discriminat[ion] against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race,

---

[10] A member of NGA Employee Relations testified that Reeves reached out to them to arrange a meeting to discuss his termination, but that after several attempts were made to meet with Reeves, the meeting did not take place. *See id.* at 81.

9

color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). In addition to establishing liability for disparate treatment on the basis of protected categories, Title VII also prohibits employers from retaliating against employees when they exercise their Title VII rights by "participat[ing] in any manner in an investigation" under Title VII, including by filing an EEOC complaint. 42 U.S.C. § 2000e–3(a). Furthermore, because "an employee's work environment is a … condition of employment, Title VII creates a hostile working environment cause of action." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 668 (4th Cir. 2011). "Plaintiffs may prove these violations either through direct and indirect evidence of … animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (cleaned up).

Reeves has brought both retaliation and hostile work environment claims against Austin and Whitworth, proceeding under the *McDonnell Douglas* burden-shifting framework as to both, rather than by direct evidence.

### A. Plaintiff Fails to Present Evidence Sufficient to Show Pretext for Retaliation

To prove that an employer unlawfully retaliated under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a *prima facie* case of retaliation by showing: "(1) [h]e engaged in a protected activity; (2) the employer acted adversely against h[im]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 653 (4th Cir. 2021) (quoting *Foster*, 787 F.3d at 250). The burden then shifts back to the employer, who must show that its allegedly retaliatory action was "the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 249. When the employer has made a showing of a legitimate nonretaliatory reason for the action, the burden again shifts back to the plaintiff to present evidence that is sufficient to rebut the reason as pretext. *See id.* However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job

10

actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006). Defendants first contend that Reeves has failed to produce sufficient evidence that any adverse employment action was causally connected to any protected activity. *See* [Doc. No. 51] at 19.

Under Title VII, complaints about violations of Title VII are protected activities. *Bryan v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003). But to support a claim of retaliation, the evidence must show that the relevant decisionmakers were alerted to the fact that the complaint was about conduct that they understood to be violation of Title VII, not a generalized grievance. *See Randa v. Garland*, 855 F. App'x 874, 877 (4th Cir. 2021). Here, Reeves contends that he engaged in protected activity (1) in August 2019, "when he complained to his supervisors … about them making inappropriate comments against Plaintiff's non-[w]hite team members[,]" [Doc. No. 58] at 9;[11] (2) when he called the NGA Anti-Harassment hotline in May 2020; (3) when he filed his informal EEOC complaint on August 7, 2020; and (4) when he filed a formal EEOC complaint in early October 2020.

Defendants dispute that Reeves engaged in protected activity in August 2019, when he told his own supervisors not to discuss his team's performance, and that none of his other protected activities, which they do not dispute, were causally connected to the October 2020 evaluation or his January 2021 termination. In that regard, Defendants point to evidence in the record that Gondeck and Cichetti did not have any awareness of Reeves' protected activity within the timeframe that allows the reasonable inference of a nexus between any protected activity and the

---

[11] According to the allegations in the Complaint, the comments made by Gondeck and Cichetti were that "they did not know what the employees of the Privacy and Civil Liberties Division did 'outside of working on an excel spreadsheet,'" and Reeves responded by telling his supervisors to "refrain from speaking about the division's performance." [Doc. No. 1] ¶ 24.

11

October 2020 performance review,[12] claiming that Reeves' poor performance reviews and consistent negative feedback long pre-dated Reeves' engagement in a protected activity, and that the October 2020 performance review was evaluated by two independent, neutral third parties and largely substantiated, with Reeves' overall rating remaining "Unacceptable." [Doc. No. 51] at 19–20.

Based on the record evidence, Reeves' August 2019 comments did not constitute protected activity. Even taking the racial makeup of Reeves' team members into consideration, no one in Cichetti and Gondeck's position could reasonably believe that Reeves' request or demand to avoid "talking about" the division's performance—of which Cichetti and Gondeck were the leaders—was a complaint about discrimination or hostility in the workplace. *See Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 161–62 (4th Cir. 2018) ("As this Court has explained, complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors ... are not actionable under Title VII.").[13] Reeves' retaliation claim based on the argument that the August 2019 comment was a protected activity fails as a matter of law.

However, there appears in the record sufficient evidence, when viewed most favorably to Reeves, to establish a *prima facie* causal nexus between his unchallenged protected activity and an adverse employment action. In that regard, while Gondeck and Cichetti may not have been formally notified of Reeves' formal EEOC complaint until January 2021, Gondeck admitted in his deposition testimony that he learned on August 27, 2020, just over one month before Reeves'

---

[12] In support of this contention, Defendants point to evidence that Reeves' supervisors became aware of his internal NGA complaints in July 2020, *viz.*, three months before the negative October 2020 performance review and six months before he was terminated, a time period that is too temporally attenuated from any adverse employment action to support a sufficient inference of causation necessary for Reeves to substantiate the third element. *See* [Doc. No. 51] at 18 (citing *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005)). Likewise, Defendants point to evidence that Gondeck and Cichetti were not told and had not otherwise learned until January 2021 that Reeves had filed a formal complaint with the EEOC in late September 2020. *See id.* (citing [Doc. No. 51-4] at 43).

[13] In its decision dismissing his discrimination claim (Count I), the Court concluded that the August 12, 2019 incident did not constitute a protected activity within the meaning of Title VII and the Court reaffirms that ruling for the purposes of Reeves' retaliation claim.

negative October 2020 performance review, that an informal EEOC complaint had been filed against him and Cichetti and he "surmised" that it was Reeves who filed it. [Doc. No. 51-2] at 168. Additionally, by the time of his negative October performance review, Cichetti and Gondeck had been recently cleared of any discriminatory conduct as a result of the internal investigation that was started in July 2020, *id.* at 169, arguably allowing the reasonable inference that Reeves' supervisors felt themselves to be in a stronger position to retaliate against Reeves through a negative performance review that led to his termination. Consequently, the record as a whole does not allow the Court to conclude as a matter of law that Reeves has failed to establish a *prima facie* case of retaliation.[14]

Nevertheless, even assuming that Reeves has established a *prima facie* case of retaliation, Defendants have clearly asserted a legitimate, nonretaliatory reason for any adverse employment actions taken against Reeves. In that regard, Reeves' poor performance, including his issues with meeting deadlines and producing quality work, was documented throughout his short, probational tenure at the NGA, and by parties other than Gondeck and Cichetti. Indeed, after his first 90 days he was given very specific feedback on these exact performance issues, including missing firm deadlines set by the Department of Defense for responding to data breach incidents. *See* [Doc. No. 51-3] at 32–40; *see also id.* at 46 (meeting notes indicate that Reeves was given an example about a high priority missed deadline from the prior week and he left for vacation without completing the work, and that "multiple teammates" had told the supervisors that Reeves did not "say hello or good morning" and that he did not respond to their salutations).[15] At least one contractor who

---

[14] Reeves argues that "several incidents," such as the exclusion of his team members from Cichetti's Halloween party, were "retaliatory," because they showed that he was being *treated differently*. Reeves' does not identify any adverse employment actions were related to these incidents, and in any event, essentially improperly conflates the legal relevance of disparate treatment—applicable to the already-dismissed claim of discrimination—with conduct legally relevant to a retaliation claim. *See* [Doc. No. 58] at 9–11, 18.

[15] Although Reeves did not list any specific performance feedback among his contested facts, Reeves' counsel submitted at oral argument that Reeves did formally contest those deadlines as part of his performance evaluation appeal. The Court has reviewed the voluminous records related to the performance reconsideration process and finds that there is no dispute of any of the deadlines set either internally or externally. Rather, Reeves appears to point to

13

worked under Reeves resigned and cited Reeves as the reason for the resignation, describing in a lengthy letter to Reeves' supervisors all of the issues that he encountered in working with Reeves. *See* [Doc. No. 51-3] at 65–69 ("I did want to make my displeasure known as he essentially disregarded and disrespected the opinions of two colleagues with no basis whatsoever."); *see also id.* at 72–75 ("Mr. Reeves cannot be counted on to provide timely or substantive contributions to MOCP work products … [and] he tends to treat everyone as though they aren't as intellectually capable as he is.").[16] And Reeves' documented failure to produce timely and quality work continued for the entire year following the initial performance feedback. *See, e.g.*, [Doc. No. 51-4] at 7–11 (documenting five incidents in just April and May of 2020 alone that Reeves missed deadlines or produced sub-par work).

As noted above, Reeves does not dispute any of the specific, concrete feedback about particular missed deadlines or work product; instead, he says that he was working with a new team, [Doc. No. 58-5] at 9, and points to various other accomplishments in arguing that the reviews were all false and pretextual. [Doc. No. 58] at 13 ("This rating was contrary to the accomplishments and projects that Plaintiff succeeded with during the fiscal year as acknowledged in his own self-assessment."). But Reeves' view of his own performance is not enough to create a dispute of fact concerning whether Defendants have asserted and established a legitimate, nonretaliatory reason for Reeves' adverse employment actions. *See Francis*, 452 F.3d at 308 ("The operative legal

---

the eventual successful completion of certain projects (including breach incident reporting) without any reference to deadlines at all. *See* [Doc. No. 58-3] at 15–50. In any event, Reeves' own weekly status reports that he submits in support of his opposition brief show that starting at the beginning of September 2019, his "tasks not completed" list includes "incident response closeout of 4 incidents," *i.e.*, the privacy breach incidents referenced by Gondeck in his "Unacceptable" review, which remained on Reeves' "not completed" list through September 26. *Id.* at 71–74. "Incident response closeout of 2 incidents" remained on the list for another two weeks, which was around the time that Reeves received his first round of feedback from Gondeck about missing deadlines. *Id.* at 75–76; *see also* [Doc. No. 51-3] at 32–40..

[16] Reeves argued at the hearing that this email, as well as other complaints about Reeves that appear in the record is "hearsay" and not admissible evidence since the persons whose negative comments are recorded were not deposed; but the fact of these comments is admissible evidence of the information that was available to Gondeck and Cichetti when evaluating Reeves because it is probative of their state of mind and motivations with respect to his termination.

14

question is not whether Francis believed that her dismissal was reasonable or that she was acting professionally. The operative question is whether, based on the undisputed evidence in the record, it was objectively reasonable for BAH to dismiss Francis.").

Having found that Defendants have asserted a legitimate nonretaliatory reason for the adverse employment actions taken against Reeves, the burden shifts to Reeves to present evidence sufficient to infer that the asserted reason was a pretext for retaliation. Here, the record is absent of any evidence sufficient for that purpose.  As an initial matter, the relied-upon poor performance as a legitimate, nonretaliatory reason for his adverse employment long predated his engagement in any protected activity, thereby precluding any inference of pretext for any retaliation because of his protected activity. *Id.* at 309 (finding that where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise"). Moreover, there is no evidence of any recognized basis upon which pretext can be reasonably inferred, such as changing explanations for the adverse employment actions or internally contradictory (or lacking) evidence. *See Foster*, 787 F.3d at 253 (finding evidence of pretext where the termination justification provided was contrary to the factual findings in the plaintiff's performance evaluations).

For the above reason, Defendants are entitled to judgment in their favor as a matter of law on Count II.

### B. Plaintiff Fails to Introduce Evidence Sufficient to Make Out a *Prima Facie* Hostile Work Environment Claim

To make out a *prima facie* case for a racially hostile work environment, a plaintiff must show that there is "(1) unwelcome conduct; (2) that is based on the plaintiff's ... race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted).

Whether the environment is hostile is an objective inquiry, and as such, is "judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). It is a totality of the circumstances test, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). The ultimate touchstone is whether and to what extend the conduct alters the work environment. *See Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023) ("A hostile work environment exists only when the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that it would reasonably be perceived, and is perceived, as hostile or abusive."). For that reason, both the Supreme Court and the Fourth Circuit have repeatedly cast doubt on claims that do not involve repeated conduct unless the single incident is "extremely serious." *Boyer-Liberto*, 786 F.3d at 277; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002). "[T]easing [and] offhand comments," or even the use of epithets without more, are generally not sufficient to maintain a racially-hostile work environment claim. *Id.* (alteration original).[17]

Reeves initially contends that because the Court did not dismiss Reeves' hostile work environment at the motion to dismiss stage, he has "previously established" that Reeves' work environment was abusive and hostile. [Doc. No. 58] at 20. The Court's ruling in that regard was substantially based on Reeves' allegation in his Complaint that Cichetti had threatened him because of his race by showing him a photo of his AR-15 assault rifle, with the comment that he

---

[17] The relationship between the alleged harasser and the plaintiff is also relevant for the purposes of determining the severity of the conduct and for assigning liability, because in the case of co-worker harassment, an employer will only be held vicariously liable if they were negligent in controlling the plaintiff's working conditions. However, in the case of supervisor harassment, an employer can be held vicariously liable for the actions of the supervisor, and supervisor conduct is considered to be of greater seriousness. *Boyer-Liberto*, 786 F.3d at 278. Here, Defendants do not appear to contest that the latter situation applies.

had no problem using it, and that he had previously threatened an African American man with the firearm. *See* [Doc. No. 29] at 6 (finding the hostile work environment claim plausible because "with a photograph of his AR-15 weapon in hand, Cichetti told Reeves that he viewed people of Reeves' class differently and was not afraid of threatening people with his firearm, including (as had apparently happened in the past) a member of Reeves' protected class"); *see also* [Doc. No. 1] ¶ 26. But in his deposition, Reeves recounted a different story.[18] Specifically, Reeves testified that after a conversation that Reeves observed between Cichetti and various unnamed contractors in which Cichetti was discussing his new firearm, the AR-15, Cichetti asked Reeves in a private setting if he would like to see it, and Reeves replied that he would. Cichetti showed Reeves a photo of the firearm and said he would have no problem with people coming onto his property now that he had the firearm, but there was no mention of him threatening an African American man with the weapon.[19] [Doc. No. 51-2] at 89–90. When specifically asked whether he thought that this incident was racially motivated, Reeves said "I believe him showing it was not motivated by race." *Id.* at 91. Thus, the primary basis upon which the Court permitted this claim to proceed has been affirmatively disclaimed by Reeves and the original allegation is unsupported by the uncontested evidence in the record.[20]

Reeves also contends that various other incidents when taken in their totality amount to a hostile work environment, including the exclusion of his team from the Halloween party, the discussions about his dress code violations (and the sticky notes commenting on his dress), his poor performance reviews, Gondeck's temperament in the February 2020 meeting, and the fact

---

[18] Cichetti also disputes Reeves' allegations, although Reeves' deposition testimony more closely tracks Cichett's testimony about what happened that day. *See* [Doc. No. 51-2] at 208–9. In particular, Cichetti said that he showed Reeves a photo of the firearm after he said he wanted to see it, following a conversation about firearms with other personnel. Cichetti said that Reeves told him he could not have a firearm because his girlfriend would not allow him to keep one in their shared living space. *See id.*

[19] Gondeck testified that Cichetti also showed Gondeck a photo of the firearm. *See id.* at 174.

[20] Reeves does, however, continue to rely on this interaction in the briefing to support his hostile work environment claim. *See* [Doc. No. 58] at 21.

17

that Cichetti allegedly told him that he views African Americans differently (which Cichetti disputes).[21]

Viewing the evidence as a whole in a light most favorably to Reeves, Reeves has failed to present evidence sufficient to establish that he was subjected to conduct that was sufficiently pervasive and severe to constitute a hostile work environment, whether independently or in combination. In that regard, no reasonable factfinder could so conclude that there was racially-motivated severe or pervasive conduct in Reeves' work environment based on (1) Reeves' *inclusion* at a Halloween party; (2) Reeves' performance feedback, in the form of both formal and informal communications concerning specific recommendations for how Reeves could improve his performance; (3) advising Reeves of his dress code violations or sending out a communication to the entire MOC team reminding them of the dress code expectations; (4) a single incident when Gondeck "balled up his fists" during the meeting about performance issues; and (5) Reeves receiving one or more sticky notes commenting on his dress, even if it was in poor taste. *Boyer-Liberto*, 786 F.3d 277 (observing that "simple teasing [and] offhand comments," are insufficient to carry the claim); *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022) ("[W]e reject [Plaintiff's] contention that one episode of yelling and pounding the table, even considered with his other allegations, is sufficiently severe or pervasive to establish an abusive environment."); *id.* ("Evaluation and criticism of one's work performance, while perhaps unpleasant, is not abusive.").

Nor is the allegation of Cichetti's comment that he views African Americans differently, which Cichetti disputes, "severe or pervasive" as that standard has been interpreted by the Fourth Circuit. *See, e.g.*, *Irani v. Palmetto Health*, 767 F. App'x 399, 417 (4th Cir. 2019) (affirming the district court's grant of summary judgment to defendants because "there is no evidence to suggest

---

[21] In his deposition, Reeves testified to a somewhat different version of what is alleged in the Complaint: he testified that Cichetti told him a story about growing up in New York and being jumped by African American men, and that "after that, he looked at *people* differently." [Doc. No. 51-2] at 90 (emphasis added). Cichetti testified that he did not mention the assailants' race until Reeves asked him about it. *See id.* at 208.

that the [supervisor's] infrequent comments [calling the plaintiff "Achmed the Terrorist"] … were so severe or pervasive as to be actionable"); *Rayyan v. Virginia Dep't of Transportation*, 719 F. App'x 198, 202 (4th Cir. 2018) (affirming the district court's grant of summary judgment to defendants despite record evidence that a supervisor called the plaintiff dumb while referring to the fact he was from the Middle East); *see also* [Doc. No. 51] at 28 (collecting cases).

For the above reasons, Defendants are entitled to judgment as a matter of law on Plaintiff's hostile work environment claim (Count III).

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Motion be, and the same hereby is, **GRANTED** as to Counts II and III and the Court having previously dismissed Count I, this action is **DISMISSED** in its entirety.

The Clerk is further directed to issue a copy of this Order to all counsel of record and enter judgment in favor of Defendants pursuant to Federal Rule of Civil Procedure 58.

May 20, 2024
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge